## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Newport News Division

JENNIFER REBECCA J.,[1]

        Plaintiff,

v.                                                          ACTION NO. 4:24cv8

CAROLYN W. COLVIN,[2]
Acting Commissioner of Social Security,

        Defendant.

### UNITED STATES MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

Jennifer Rebecca J. ("plaintiff") filed this action for review of a decision by the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying her claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). An order of reference assigned this matter to the undersigned. ECF No. 6. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, the undersigned recommends that plaintiff's motion, ECF No. 10, be **GRANTED**, the final decision of the Commissioner be **VACATED**, and the case be **REMANDED**.

---

[1] In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name has been redacted for privacy reasons. Comm. on Ct. Admin. & Case Mgmt. Jud. Conf. U.S., Privacy Concern Regarding Social Security and Immigration Opinions 3 (2018).

[2] Carolyn W. Colvin is now the Acting Commissioner of Social Security and is automatically substituted as a party pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. *See also* 42 U.S.C. § 405(g) (providing that an action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

# I.   PROCEDURAL BACKGROUND

Plaintiff applied for disability insurance benefits in early 2021, alleging she became disabled on November 8, 2020, R. 192–98,[3] due to anxiety, depression, Lyme disease, and fibromyalgia, R. 271.  Following the state agency's denial of her claim, both initially, R. 63–73, and upon reconsideration, R. 75–84, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), R. 109–10.  ALJ John Dowling heard the matter on April 18, 2023, R. 43–62, and issued a decision denying benefits on April 27, 2023, R. 26–37.  On November 21, 2023, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  R. 6–14.  Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. § 404.981.

Having exhausted administrative remedies, plaintiff filed her complaint on January 10, 2024.  ECF No. 1.  Plaintiff moved for summary judgment on May 16, 2024, with an accompanying memorandum of law in support ("Pl.'s Mem.").[4]  ECF Nos. 10–11.  On June 17, 2024, the Commissioner filed a brief in support of the Commissioner's decision and in opposition to plaintiff's social security appeal ("Def.'s Mem.").  ECF No. 13.  Plaintiff replied on July 1, 2024.  ECF No. 14.  As oral argument is not required, the case is deemed submitted for a decision.

## II.   RELEVANT FACTUAL BACKGROUND

### A.   Background Information and Hearing Testimony by Plaintiff

Plaintiff was 46 years old as of November 8, 2020, the alleged onset date of disability.  R. 64.  Plaintiff is married and lives with her husband, mother, daughter, and three grandchildren.  R.

---

[3] Page citations are to the administrative record that the Commissioner filed with the Court.

[4] Although plaintiff filed a motion for summary judgment, the Court treats plaintiff's motion and accompanying brief as the brief in support of her appeal required by Rule 6 of the Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g) of the Federal Rules of Civil Procedure.

47.  She has an associate's degree in human services.  R. 48.  Plaintiff worked full-time as a case manager/benefits program specialist from March 2019 through October 2020.  R. 49, 326–27. Beginning in July 2001, plaintiff worked as a patient care representative.  R. 326–27.  Plaintiff stopped working in 2020 because her fibromyalgia caused "excruciating" pain and "very bad anxiety and depression."  R. 50.  She explained that after "sitting for a long time," she would "lock up" and "have burning sensations."  R. 50–51.  Plaintiff also testified that her "wrists would lock up from typing," and that her fibromyalgia was the cause of her anxiety.  R. 51.

Moreover, "on certain days," plaintiff can do her daily activities, including cooking, cleaning, and laundry, but she must "break it up" so that she does not "trigger it."  R. 54.  Plaintiff does not go grocery shopping, do yard work, or pay any of her bills; others complete these tasks for her.  *Id.*  She can sit comfortably for "maybe two hours" and can walk for "30 minutes to maybe an hour" before her hip would lock up.  R. 55.  That said, she can only walk for "maybe ten minutes" before she would need a break and stands in one spot for "maybe [10], 15 minutes."  R. 55–56.

As for mental health, plaintiff's anxiety, depression, and pain keep her up at night, and she sleeps "on and off maybe six hours."  R. 56.  Lastly, plaintiff has problems completing tasks and lives with anxiety every day.  R. 57.

On June 4, 2021, plaintiff completed an adult function report.  R. 282–89.  She claimed she could not work because:  her illness, and attendant brain fog, affects her concentration and ability to "remember simple daily things"; sitting, walking, and standing causes her pain; she has prescribed eyeglasses because of blurred vision and first stage glaucoma; she is depressed as a result of her ailments; and she suffers from headaches, "especially when attempting to read or concentrate."  R. 282.  On a typical day, plaintiff wakes up between 9:30 and 10:00 a.m., and then,

with help from a family member, eats breakfast, bathes, and takes her medication.  R. 283. Depending on her pain level, plaintiff will sit in a recliner, watch television, or listen to an audiobook.  *Id.*  She becomes sleepy "after about an hour" because of her medications and takes a nap.  *Id.*  Plaintiff spends approximately 90 percent of the time in her house, which makes her depressed.  R. 289.  Family members need to remind plaintiff to attend appointments, to eat, to groom herself, to take her medication, and how many pills to take.  R. 284, 287.  Additionally, she can only pay attention for 5 to 10 minutes and does not finish what she starts.  R. 287.  She also cannot follow written instructions and often requires a person to repeat spoken instructions "numerous times."  *Id.*  Plaintiff is most productive midday, "for about an hour or so," but her pain increases in the evening, and she becomes "fidgety."  R. 289.  She only drives in an "emergency situation" and cannot go out alone because of brain fog, confusion, blurred vision, and "blackout moments."  R. 285.  Although plaintiff handled stress well "prior to [her] illness," stress now "causes [her] pain to increase."  R. 288.

**B.      Hearing Testimony of Vocational Expert Celena Earl**

Celena Earl, a vocational expert ("VE"), testified at the hearing before the ALJ.  R. 57–61. VE Earl first testified that a hypothetical person who, among other functional limitations, was limited to simple, routine tasks in a low stress job, could not return to the semi-skilled work plaintiff performed as a case aide or as a patient care representative.  R. 58–59.

VE Earl also responded to a series of hypothetical questions posed by the ALJ.  R. 59–61. The ALJ inquired, among other things, about the existence of jobs in the national economy for a hypothetical person:  (a) capable of light exertion; (b) who can frequently climb ramps or stairs; (c) who can never climb ladders, ropes, or scaffolds; (d) who must avoid frequent exposure to non-weather related cold temperatures and to vibration such as a shaking object or surface; (e) who is limited to simple, routine tasks in a low stress job, defined as having only occasional decision-

making and only occasional changes in the work setting.  R. 59.  Based on these factors, VE Earl

testified that such a person could work as a ticket marker or office helper.  *Id.*  The ALJ also asked

whether jobs exist in the national economy for a hypothetical person who had all the limitations

set forth above but was limited to sedentary work.  *Id.*  VE Earl testified that such a person could

work as a document preparer, order clerk, or polisher.  R. 60.

**C.**     **Relevant Medical Record**

  **1.**     **Treatment with Dr. Todd A. Weisman—2020 through 2023**

On April 15, 2020, plaintiff saw Todd A. Weisman, M.D. via teleheath, at Old Hampton

Family Practice.  R. 397–99.  Plaintiff had a twitch above her right eyebrow for three weeks and

twitching in her left arm and left thigh the week before.  R. 398.  Plaintiff reported that she also

had burning lips, a "burning sensation diffuse inside body," "arthralgias [in the] neck, back, knee

and wrist with stiffness[,]" and difficulty thinking clearly.  *Id.*  Plaintiff noted that she was

previously on Prilosec and had only started retaking it the week before.  *Id.*  On examination, Dr.

Weisman noted that plaintiff was positive for fatigue, chronic constipation, nausea, and headaches,

and negative for weight loss, fever, chills, palpitations, cough, hemoptysis, dysuria, arthralgias,

and seizures.  *Id.*  He ordered various labs, including a metabolic panel, magnesium serum, thyroid

cascade, and vitamin B12.  R. 397–98.  On April 16, 2020, Dr. Weisman reported that plaintiff's

antinuclear antibody screen was negative.  R. 394.

Plaintiff presented to Dr. Weisman again on June 24, 2020, via telehealth.  R. 393–95, 848–

50.  Plaintiff reported arthralgias in her hands, knees, hips, and ankles, as well as "brain fog" with

poor memory for the last year (worsening in the month before), increasing anxious and depressed

moods, fatigue, chest pain, and crying spells.  R. 394.  She had occasional "red blotches episodic

with papular lesions" on her "head, trunk, and legs" for an uncertain duration.  *Id.*  Plaintiff's

examination revealed normal heart rate, rhythm, and sounds, and no peripheral edema or murmur. R. 394–95. Plaintiff was alert with normal strength and a normal mood/affect. R. 395.

On August 13, 2020, plaintiff presented to Dr. Weisman via telehealth. R. 387–89. Plaintiff was positive for myalgias, arthralgias, insomnia, and nervous/anxious and depressed mood, and was negative for suicidal ideas. R. 388. Plaintiff said that taking Cymbalta made her "feel strange" after the first dose, but she planned to try taking it again that weekend. *Id.* Plaintiff denied feeling hopeless or worthless. *Id.*

Plaintiff saw Dylan George, N.P., on October 6, 2020. R. 385–87. Plaintiff reported that her anxiety symptoms had been worsening over the prior couple of weeks, and that the symptoms "revolve heavily around her work" which had "gotten her to the point of crying," and caused physical manifestations. R. 385. Plaintiff was "deferring starting" a selective serotonin reuptake inhibitor ("SSRI") but was agreeable to starting buspirone 5 mg. as needed and to a counselor referral. R. 385, 387. Plaintiff requested "some time off from work to help distress and decompress." R. 385. She stated that her anxiety contributed to her fibromyalgia pain, and that when she tried taking Cymbalta twice, she had alterations in her vision and hallucinations. *Id.* NP George indicated that plaintiff appeared "to have a mildly depressed mood[,]" and referred her to psychology for a "[c]urrent mild episode of major depressive disorder, unspecific whether recurrent." R. 386–87.

On October 20, 2020, plaintiff returned to NP George and reported three episodes of near syncope in the previous two weeks, and that dizziness occurred with rapid eye movement or when she was laying down. R. 382. Plaintiff said that she was recently diagnosed with fibromyalgia and Lyme disease, and that she was "currently experiencing severe fibroflare," and had requested three months of short-term disability. *Id.* A physical examination revealed:   (a) a normal

appearance, heart rate, heart rhythm, pulses, and heart sounds; (b) she was alert and oriented to person, place, and time; (c) her appearance and behavior was normal; and (d) her thought content was normal and did not include homicidal or suicidal ideation. R. 383. NP George prescribed meclizine for plaintiff's vertigo. *Id.* He also noted that a neurological exam showed "no acute abnormality[,]" and ordered additional testing. R. 383–84.

Plaintiff next saw Dr. Weisman on February 4, 2021. R. 376–79. She reported depression and anxiety, worsening "jumping" muscles, popping with pain in her left knee, episodic burning pain in heals and ankles, blurred vision, joint pain, and myalgias. R. 377–78. Dr Weisman prescribed "low dose Zoloft." R. 377. On March 16, 2021, plaintiff returned to Dr. Weisman. R. 369–72. She was tolerating the Zoloft well, with "modest improvement." R. 370. She reported blurred vision, joint pain, myalgias, dizziness, sensory change, and depression, and she was nervous/anxious. *Id.* Plaintiff's examination revealed a normal mood and affect. R. 371.

When plaintiff saw NP George on June 3, 2021, she was experiencing worsening "bilateral peripheral edema[,]" her pain symptoms were causing worsening of her depression symptoms, and when she stopped taking Zoloft, which she described as "ineffective[,]" plaintiff "noticed worsening anxiety and depression symptoms." R. 587. NP George increased her Zoloft to 50 mg. R. 588.

Plaintiff presented to Dr. Weisman again on September 29, 2021, for a "current severe episode of major depressive disorder without psychotic features[.]" R. 895–99. She was "doing poorly[,]" stated that she "feels defeated[,]" and had good compliance taking the Zoloft (although she reported she had "some degree zombie feeling on it"). R. 896. Dr. Weisman tapered her Zoloft to 25 mg. and started her on Wellbutrin XL 150 mg. with an "urgent" psychiatry referral. *Id.*

On October 17, 2022,[5] plaintiff sought a preoperative consultation with Dr. Weisman for cosmetic surgery. R. 988. Dr. Weisman noted that she was "not nervous/anxious" and noted plaintiff's report of being "[i]n a good place right now." R. 991. A wellness check on February 7, 2023, revealed for the first time that plaintiff was taking clonazepam for anxiety.[6] R. 962.

2.     **Tina M. Valentine, N.P., Riverside Rheumatology Specialists—2020 through 2022**

On July 23, 2020, plaintiff presented to Tina M. Valentine, N.P., at Riverside Rheumatology Specialists for a consultation requested by Dr. Weisman "for evaluation and or opinion of polyarthralgia." R. 729–33. In July 2019, plaintiff began experiencing "migratory joint pain affecting knees, ankles, wrists, plantar feet, hips, low back, neck, and hands." R. 730. She did not describe "swollen erythema joints[,]" but reported experiencing a "'burning sensation wave' flares through her body[,]" two to three times a week, that caused "worsening joint pain" and her to be bedridden. *Id.* Plaintiff had been recently prescribed doxycycline for "positive IgM Lyme," which "helped with the flares[,]" was previously prescribed Gabapentin which did not work, but was not currently taking medications. *Id.* She also reported that morning stiffness lasted between one and two hours and complained of memory loss, sleep disturbance, and brain fog. R. 730–31. Although plaintiff reported "increasing and worsening anxiety and depression[,]" she was not receiving treatment. R. 730, 732. A physical examination revealed that she: appeared "well-developed"; was "alert, oriented, conversant"; had a normal range of motion; and had "tenderness to bilateral wrist with no synovitis and with a cross compression of MTP joints of bilateral feet." R. 732. NP Valentine prescribed plaintiff Cymbalta 30 mg. daily. R. 730.

---

[5] Between September 2021 and October 2022, plaintiff presented to Dr. Weisman for routine visits. *See* R. 1059 (February 15, 2022 – COVID-19); R. 1033 (May 3, 2022 – back pain); R. 1049 (February 22, 2022 – ovarian cyst); R. 1014 (August 30, 2022 – back pain).

[6] The record does not indicate which provider prescribed clonazepam.

Plaintiff returned to NP Valentine for a follow-up appointment on August 12, 2020. R. 725–29. Her autoimmune serologies were "unrevealing." R. 726. Plaintiff tried taking the Cymbalta once and had side effects, including being "loopy and some visual disturbances." *Id.* She wanted to try taking the Cymbalta one more time, and NP Valentine referred her to her primary care provider for management of anxiety, depression, and fibromyalgia, and instructed her to follow-up as needed. R. 728.

NP Valentine saw plaintiff on September 29, 2022, for "joint pain and elevated inflammatory markers." R. 941. Plaintiff reported "increasing and worsening anxiety and depression[,]" and that she was not taking any medications, but previously would self-manage when she did. *Id.* A physical examination revealed that: (a) she was alert, oriented, conversant, and fluent in speech; (b) she had a normal mental status; (c) she had a strong grip with no tenderness to her elbows, wrists, and joints; (d) bilateral knees had crepitus without swelling or increased warmth, and tenderness around her ankles or cross compression of joints; and (e) she had normal behavior, judgment, and thought content. R. 945. NP Valentine noted that plaintiff's autoimmune serologies were "unrevealing" and there was no reason to conclude that plaintiff had an active autoimmune disease. *Id.*

### 3.    Andrew H. Miller, D.O., Sentara Rheumatology Kempsville—2021

On April 12, 2021, plaintiff presented to Andrew H. Miller, D.O., at Sentara Rheumatology as a new patient. R. 541–43. Plaintiff reported that most days she has "chronic paraesthesia in the arms and legs[,]" muscle aches and tenderness, and joint stillness. R. 541. She also reported "intermittent dizziness" and a few "black out" spells. *Id.* Plaintiff's "rheumatology work up did not show any clear evidence of autoimmune disease[,]" and her neurology work up was "unremarkable." *Id.* Dr. Miller's initial concern was fibromyalgia, but, because of plaintiff's elevated ESR, he ordered tests to rule out "connected tissue disease[,]" rheumatoid arthritis,

hepatitis B and C, thyroid and parathyroid disease, paraproteinemia with elevated ESR, and normal c-reactive protein ("CRP"). *Id.* Plaintiff was positive for depression, hallucinations, and anxiety. R. 543.

When plaintiff returned on April 27, 2021 for a follow-up visit, Dr. Miller noted that plaintiff's presentation was "most compatible" with fibromyalgia syndrome. R. 534. Dr. Miller noted that (a) Plaintiff's ESR appeared to be "an outlier"; (b) her CRP was normal; (c) testing for autoimmune disease was negative; and (d) her serum immunofixation was "unremarkable." *Id.* Plaintiff had tried medications for fibromyalgia, Cymbalta was poorly tolerated, and Gabapentin "was not clearly effective[.]" *Id.* Dr. Miller recommended trying Lyrica 50 mg. twice daily, staying active with low impact exercise, and a follow-up in six weeks. *Id.*

On August 10, 2021, plaintiff had "partial improvement" in her fibromyalgia, and the Lyrica was "well tolerated." R. 855. Plaintiff, however, still had some tenderness in her neck and shoulder areas, chronic back pain, and "some popping sensations." *Id.* Dr. Miller's examination revealed tender neck and shoulder muscles, stable knees, no synovitis in the hands, wrists, elbows, knees, or ankles, and normal strength and tone in all four extremities. R. 856. Dr. Miller recommended increasing the Lyrica to 100 mg. twice daily. R. 855

### 4.    Mental Health Provider Records

Plaintiff presented to the Center for Child and Family Services to establish counseling services with Nicole Dandridge, M.S.W., on February 10, 2021. R. 511–14. At that time, plaintiff reported attending counseling approximately two years before. R. 511–12. She discussed multiple life stressors, and reported "low mood and low energy, poor appetite and insomnia." R. 511. She also stated that she had previously been diagnosed with attention deficit disorder ("ADD") between 2016 and 2018. R. 514. Plaintiff reported that she volunteers at a nonprofit, and loves to cook, read, and spend time with family. R. 512. Ms. Dandridge noted that: plaintiff was fully oriented;

10

her concentration, memory, appearance, energy, thought process, and thought content were normal; her eye contact was good; her appetite was adequate; her motor activity was calm; her affect was appropriate; her speech was fluent; and she had insomnia. R. 513. Ms. Dandridge diagnosed an adjustment disorder with mixed anxiety and depressed mood. R. 514. Plaintiff saw Ms. Dandridge five other times until plaintiff terminated services in July 2021. R. 515–522, 628. Ms. Dandridge noted for all five visits that plaintiff was on time, appropriately dressed, actively engaged, reflective, and insightful, and her mood was calm, and affect was appropriate. *Id.* On April 12, 2021, however, it was noted that plaintiff "did fidget at times during the session." R. 522.

On October 13, 2021, plaintiff presented to Laurie Stephens, PMHNP-BC, of Hampton Mental Health Associates for medication management via telehealth. R. 936–39. NP Stephens reported plaintiff was experiencing:    anhedonia, crying spells, impaired concentration, indecisiveness, insomnia, irritability, low energy, social isolation, suicidal thoughts, weight changes, avoidance, dysphoria, nervousness, perseveration, and racing thoughts.    R. 936. Plaintiff's diagnoses included major depressive disorder, single episode, moderate, generalized anxiety disorder ("GAD"), and attention-deficit hyperactivity disorder (based on prior treatment with Vyvanse in 2018). R. 938. NP Stephens prescribed Pristiq ER and discontinued Wellbutrin that Dr. Weisman had prescribed. *Id.* Although plaintiff indicated that she had not yet started taking Pristiq at her appointment on November 10, 2021, R. 935, she reported on February 23, 2022, that she took it for one week and did not stay on it constantly, R. 930.

Plaintiff saw NP Stephens four other times:   March 31, 2022, R. 924; June 30, 2022, R. 920; February 1, 2023, R. 916; and March 7, 2023, R. 912. At all these appointments, plaintiff's mood remained anxious and mildly depressed with congruent affect, her affect was other than congruent and depressive, and there were "[n]o deficits noted on observation with respect to focus

and concentration." R. 913, 917, 921, 925. On June 30, 2022, NP Stephens increased plaintiff's Pristiq dosage as there was "[n]o discernable benefit" from the prior dose, but it was lowered on February 1, 2023. R. 918, 922.

**D.    Medical Opinions**

**1.    State Agency Consultants' Review—July, August, and December 2021.**

In July and August 2021, state agency consultants Bert Spetzler, M.D. and Howard Leizer, Ph.D., reviewed plaintiff's medical records and issued an initial disability determination. R. 64–73. The initial disability determination found that plaintiff had the following severe medically determinable impairments: (a) fibromyalgia; (b) depressive, bipolar, and related disorders; (c) immune deficiency disorders, excluding HIV infection; (d) glaucoma; (e) anxiety and obsessive-compulsive disorders; and (f) disorders of the skeletal spine.[7] R. 67.

Dr. H. Leizer found that plaintiff did not have a medically determinable impairment that satisfied the criteria of either listing 12.04 (depressive, bipolar, and related disorders) or listing 12.06 (anxiety and obsessive-compulsive disorders). R. 68. As to limitations in sustained concentration and persistence, Dr. H. Leizer rated plaintiff as "moderately limited" in her ability to: carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; and complete a normal workday or workweek without interruptions from psychologically-based symptoms and to

---

[7] Plaintiff's argument focuses on her moderate limitations in concentrating, persisting, or maintaining pace. Pl.'s Br. 8–13. The ALJ's finding of a moderate limitation was based on his review of plaintiff's mental impairments. R. 30. The parties' briefing discusses only the state agency psychological consultants' mental findings. Pl.'s Mem. 11; Def.'s Mem. 6–7, 17–18. Therefore, the Court focuses its discussion and recitation of the facts on the opinions of the state agency mental health consultants.

perform at a consistent pace without an unreasonable number and length of rest periods.[8]  R. 71.

In his narrative explanation, Dr. H. Leizer noted plaintiff's history of adjustment disorder with

mixed anxiety and depressed mood, that she received mental health treatment from a counselor,

and that Dr. Weisman prescribed mental health medications.  *Id.*  He also stated that plaintiff's

mental health records show that she has normal memory, thought process, and concentration.  *Id.*

And, although plaintiff's activities of daily living showed mental health limitations, Dr. H. Leizer

concluded that the "[o]verall evidence" suggested that she "is capable of simple, routine tasks."

R. 72.

At the reconsideration level, state agency consultants Joseph Leizer, Ph.D. and Jack

Hutcheson, Jr., M.D., reviewed plaintiff's medical records again in December 2021.  R. 76–84.

The consultants found that plaintiff had the same severe impairments found at the initial level.  R.

78.  Dr. J. Leizer evaluated plaintiff under the same listings as Dr. H. Leizer did and rated plaintiff's

limitations the same, with the exception that he rated plaintiff's ability to sustain an ordinary

routine without special supervision "not significantly limited," rather than "moderately limited."

*Compare* R. 82 (reconsideration ratings), *with* R. 71 (initial ratings).  Additionally, Dr. J. Leizer

provided the same narrative explanation after rating plaintiff's limitations in sustaining

concentration and persistence as Dr. H. Leizer,[9] *compare* R. 82 (reconsideration narrative), *with* R.

---

[8] Additionally, Dr. H. Leizer rated plaintiff as "not significantly limited" in her ability to carry out very short and simple instructions and to make simple work-related decisions.  R. 71.

[9] As for social interactions, both Dr. Leizers assigned moderate limitation ratings to plaintiff's ability to:  interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  R. 72, 82.  Both also rated plaintiff's ability to ask simple questions or request assistance as "not significantly limited[,]" and provided a narrative explanation of these ratings.  R. 72, 82–83.

71 (initial narrative).  Dr. J. Leizer opined that the "[o]verall evidence" indicated that plaintiff "is capable of simple, routine tasks." R. 83.

### 2.      Medical Source Statement by Dr. Weisman—April 2023

Dr. Weisman submitted a medical source statement on April 13, 2023.  R. 1094–98.  He stated that he began treating plaintiff in July 2020 for fibromyalgia.  R. 1094.  He concluded that plaintiff's pain and fatigue would:  (a) affect her concentration/memory and cause an inability to focus and stay on task in a work setting 80 percent of a work day; (b) require extra rest breaks causing her to be off task in a work setting for more than one hour during an eight-hour workday; and (c) require plaintiff to have bedrest such that she could not report to work for, on average, 15 days per month.[10]  R. 1094.  Relating to plaintiff's mental capacities, Dr. Weisman found plaintiff had marked limitations in her abilities to:   remember locations and work-like procedures; understand, remember, and execute detailed instructions; maintain attention and concentration for reasonable periods of time; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; interact appropriately with the general public; accept instructions or respond appropriately to criticism from supervisors; and respond appropriately to customary stresses in a work setting.  R. 1097.  He further found that plaintiff was moderately limited in her abilities to understand, remember, and execute very short and simple instructions; sustain an ordinary routine without special supervision; and get along with co-workers or peers without distracting them.  *Id.*

---

[10] Dr. Weisman also concluded that plaintiff could not work full-time at any level of exertion, could sit for one hour and stand or walk for one hour, each during an eight-hour workday.  R. 1095.  Dr. Weisman further concluded that plaintiff could not use her feet for repetitive movements (as in pushing and pulling of leg controls), and that she was:  (a) totally restricted in activities involving unprotected heights, being around machinery, and exposure to marked changes in temperature and humidity; (b) mildly restricted in activities involving driving automotive equipment; (c) not restricted in activities involving exposure to dust, fumes, and gases.  R. 1096.

### III.  THE ALJ'S DECISION

To evaluate plaintiff's claim of disability,[11] the ALJ followed the sequential five-step analysis set forth in the SSA's regulations.  *See* 20 C.F.R. § 404.1520(a).  Specifically, the ALJ considered whether plaintiff:  (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents her from performing any past relevant work in light of her residual functional capacity; and (5) had an impairment that prevents her from engaging in any substantial gainful employment.  R. 28–36.

The ALJ found that plaintiff met the insured requirements[12] of the Social Security Act through December 31, 2025, and had not engaged in substantial gainful activity from November 8, 2020, her alleged onset date of disability.  R. 28.

At steps two and three, the ALJ found that plaintiff had the following severe impairments: (a) fibromyalgia; (b) major depressive disorder; and (c) generalized anxiety disorder.  *Id.*  The ALJ classified all other impairments as non-severe or non-medically determinable because they responded to treatment, failed to significantly limit plaintiff's ability to engage in basic work activities, had not or were not expected to last at a "severe" level for a 12-month continuous period, were not expected to result in death, or were not properly diagnosed by an acceptable medical

---

[11] To qualify for DIB, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a)  To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy.  20 C.F.R. § 404.1505(a).

[12] To qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

source.  *Id.*  The ALJ also determined that plaintiff's severe impairments, either singly or in combination (along with her other conditions), did not meet the severity of one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App.1, as would be required for a finding of disability at step three.  R. 29–31.

As for plaintiff's mental impairments, the ALJ considered the criteria of listings 12.04 and 12.06, by looking to whether the "paragraph B" criteria were satisfied.  R. 30.  The ALJ found that plaintiff had:  (a) mild limitations in (i) understanding, remembering, or applying information, and (ii) interacting with others; and (b) moderate limitations in (i) concentrating persisting and maintaining pace, and (ii) adapting or managing oneself.  R. 30–31.

Next, the ALJ found that plaintiff possessed the residual functional capacity ("RFC") to perform light work, *see* 20 C.F.R. § 404.1567(b), subject to the limitations that she:  (a) can frequently climb ramps or stairs; (b) never climb ladders, ropes, or scaffolds; (c) must avoid frequent exposure to nonweather-related cold temperatures; (d) must avoid frequent exposure to vibration, such as a shaking object or surface; (e) "is limited to simple, routine tasks"; and (f) is limited "to work in a low stress job, defined as having only occasional decision-making required and only occasional changes in the work setting."  R. 31.

Based on this RFC, the ALJ found at step four that plaintiff could not resume working as a case aide.  R. 35.  Finally, at step five, the ALJ found, having considered plaintiff's RFC, age, education, work experience, and VE Earl's testimony, that plaintiff could perform other jobs such as a ticket marker and an office helper, which existed in significant numbers in the national economy.  R. 35–36.

Accordingly, the ALJ concluded that plaintiff was not disabled, as defined in the Social Security Act, from November 8, 2020, through the date of the decision.  R. 36.

## IV.  STANDARD OF REVIEW

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits.  42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456.  "'Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ).'" *Craig*, 76 F.3d at 589 (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)).  The Commissioner's findings on any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).  Thus, reversing the denial of benefits is appropriate only if either (a) the record is devoid of substantial evidence supporting the ALJ's determination, or (b) the ALJ made an error of law. *Id.*

## V.   ANALYSIS

**The ALJ neither accounted for plaintiff's moderate limitations in concentration, persistence, or pace in the RFC, nor did the ALJ explain why such a limitation was not necessary to account for those limitations.**

Plaintiff seeks a remand for further administrative proceedings under the Fourth Circuit's decision in *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015), because the ALJ disregarded his finding that plaintiff had a moderate limitation[13] in concentrating, persisting, or maintaining pace ("CPP") in his RFC determination. Pl.'s Mem. 8–13. Plaintiff asserts that the ALJ's conclusion that the record "supports limitations to simple, routine tasks[,]" *id.* at 9–10 (citing R. 33), "does not reconcile" his finding of a moderate limitation in CPP with the RFC, *id.* at 10. Plaintiff also contends that the ALJ's reliance on "positive mental findings[,]" *id.* at 11, such as a good affect and eye contact, generally do not bear on her CPP abilities. Pl.'s Reply to Def.'s Mem. in Supp. of her Mot. for Summ. J., ECF No. 14, at 2, 4. Lastly, plaintiff argues that the ALJ erred by concluding that plaintiff's anxious mood and an observation of fidgeting supported "significant limitation" in CPP, but "preparing basic meals and shopping for groceries using a computer supports the ability to perform simple tasks." Pl.'s Mem. at 12 (citing R. 30). According to plaintiff, this explanation only encompasses her ability to perform tasks, not her ability to stay on task as *Mascio* requires. *Id.*

The Commissioner counters that the ALJ both sufficiently accounted for plaintiff's moderate limitation in CPP and adequately explained why the record supports a limitation to "simple, routine tasks" as the only mental limitation in the RFC. Def.'s Mem. 13–14. The Commissioner notes that the ALJ recounted plaintiff's allegations of mental limitations—

---

[13] A moderate limitation means that a claimant's ability to function in an "area independently, appropriately, effectively, and on a sustained basis is fair." 20 C.F.R. Pt. 404, Subpt. P., App'x 1 § 12.00(F)(2)(c).

including difficulty concentrating, anxiety, and difficulty completing tasks—but concluded that her statements "concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record." *Id.* at 15 (citing R. 32). The Commissioner also argues that the ALJ explained "that panic attacks, racing thoughts, impaired concentration, anxious and depressed mood, and fidgety behavior support limitations to simple, routine tasks." *Id.* (citing R. 33). The Commissioner contends that the ALJ explained in detail why the medical evidence in the record did not support additional mental limitations in the RFC, and adequately evaluated the medical opinion evidence and prior administrative medical findings. *Id.* at 16–17 (citing R. 34–35). According to the Commissioner, the Court is not "'left to guess' or 'uncertain as to what the ALJ intended' . . . because the ALJ explained his findings." *Id.* at 19 (quoting *Mascio*, 780 F.3d at 637).

Having considered the record, the medical evidence, plaintiff's hearing testimony, the ALJ's written decision, and the parties' contentions, the Court finds that the ALJ failed to explain how the RFC accounts for plaintiff's functional mental limitations considering her moderate limitations in concentration, persistence, or pace that the ALJ found at step three. The link between the ALJ's discussion of the medical evidence and the lack of a CPP limitation in the RFC is absent from the ALJ's discussion.

As part of the five-step sequential analysis, an ALJ must determine a claimant's RFC. *See* 20 C.F.R. § 404.1545. The RFC is "the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting . . . 8 hours a day, for 5 days a week." Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis in original). An ALJ must assess a claimant's work-related abilities on a function-by-function basis. *Id.* at *3 (assessing physical, mental, and other abilities to perform work requirements given limitations and

impairments).  After doing so, the ALJ may express the RFC in terms of both the exertional levels of work (sedentary, light, medium, heavy, and very heavy) and the non-exertional functions supported by the evidence.  *Id.*  In determining a claimant's RFC, the ALJ must consider all relevant medical and other evidence in the record.[14]  20 C.F.R. § 404.1545(a)(3).  The ALJ then uses the RFC to determine whether the claimant can perform her past relevant work (step four), and whether the claimant can adjust to any other work that exists in the national economy (step five).  *Id.* § 404.1545(a)(5).

The Fourth Circuit has made clear that an ALJ must provide an adequate narrative discussion to allow for substantial evidence review.  *See Thomas v. Berryhill*, 916 F.3d 307, 311–13 (4th Cir. 2019).  As for mental impairments, in *Mascio*, the Fourth Circuit held that when an ALJ finds that a claimant has moderate limitations in CPP, an ALJ must reconcile that finding in the RFC determination.  780 F.3d at 638.  Because "the ability to perform simple tasks differs from the ability to stay on task[,]" a mere limitation to simple or routine tasks, or unskilled work, is insufficient.  *Id.*  Only a limitation relating to a claimant's ability to stay on task would account for a moderate limitation in CPP.  *Id.*  Thus, on finding of a moderate limitation in CPP at step three, an ALJ is required to either:  (a) include limitations in the RFC that account for the same; *or* (b) explain "why [the] moderate limitation in concentration, persistence, or pace at step three does not translate into a limitation in [the claimant's RFC]."  *Id.*; *see also Carol F. v. Saul*, No. 2:19cv155, 2020 WL 3966829, at *9 (E.D. Va. June 9, 2020), *report and recommendation adopted*, 2020 WL 3960579 (E.D. Va. July 13, 2020), *aff'd*, No. 20-1985, 2022 WL 1090254 (4th Cir. Apr. 12, 2022).

---

[14] "Other evidence" includes statements or reports from the claimant, the claimant's treating or non-treating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work.  20 C.F.R. § 404.1529(a).

If the ALJ does not account for the limitation in the RFC, but opts to take the latter route, "the ALJ must engage in sufficient analysis and explanation for a court to meaningfully review those conclusions." *Peter J. H. v. Kijakazi*, No. 2:22cv487, 2023 WL 5967591, at \*10 (E.D. Va. Aug. 14, 2023) (citing *Carol F.*, 2020 WL 3966829, at \*9); *see also Carol F.*, 2020 WL 3966829, at \*9 ("[I]f an ALJ explains why moderate deficits in concentrating, persisting, or keeping pace do not necessitate additional limitations in a claimant's RFC, no remand is needed if the explanation adequately addresses why such deficits do not affect a claimant's ability to work.").

For example, in *Shinaberry v. Saul*, the Fourth Circuit held that the ALJ's review and discussion of the pertinent evidence—including the state agency consultants' mental health assessments and consultative examination findings, as well as the claimant's adult function report—"sufficiently explained why the mental limitation to simple, routine, and repetitive tasks accounted for [claimant]'s borderline intellectual disability and her moderate limitations in . . . concentration, persistence[,] or pace." 952 F.3d 113, 121–22 (4th Cir. 2020). The court highlighted that the ALJ considered claimant's "lifelong, borderline intellectual disability" and her statements that "she does not know how long she can pay attention, sometimes finishes what she starts, and follows spoken instructions not the best" and then "explained why the psychological evidence and [claimant]'s statements support a mental limitation to simple, routine, and repetitive tasks." *Id.* at 122.

In this case, at step three of the sequential evaluation process outlined above, the ALJ discussed plaintiff's medical records, hearing testimony, and adult function report, noting: (a) that plaintiff can pay attention for only five to ten minutes; (b) plaintiff does not finish what she starts; (c) that the record shows symptoms such as panic attacks and racing thoughts; (c) evidence supported findings of anxious mood and an observation of fidgeting; (d) that she can prepare basic

21

meals for herself and shop for groceries and household supplies via computer; and (e) that mental status examinations revealed "normal concentration, logical or normal thought process, normal thought content, and no attentional deficits[.]"  R. 30.  Based on this review and discussion, the ALJ found that, based on the "paragraph B" criteria, plaintiff had a moderate limitation in CPP. *Id.*; *see also* R. 30–31 (assessing plaintiff's abilities to understand, remember, or apply information; interact with others; and to adapt or manage herself).

The ALJ then undertook a "more detailed assessment" of plaintiff's areas of mental functioning in fashioning plaintiff's "mental residual functional capacity assessment used at steps 4 and 5[.]"  R. 31.  In determining the RFC, the ALJ considered and discussed the medical and opinion evidence in the record, including plaintiff's:  (a) physical and mental health conditions; (b) symptoms; (c) hearing testimony; (d) activities of daily living, family situation, and function reports; and (e) responsiveness to medication and treatment.  R. 30–35.  Despite finding that plaintiff had moderate limitations in CPP, the only RFC limitations the ALJ imposed to account for plaintiff's mental impairments[15] were that plaintiff was limited "to perform[ing] simple, routine tasks and work in a low stress job, defined as having only occasional decision-making required and only occasional changes in the work setting."  R. 31.

The ALJ concluded that plaintiff's reports of panic attacks, racing thoughts, impaired concentration, anxious and depressed mood, and an observation of fidgety behavior support limitations to simple, routine tasks.  R. 33.  In further limiting plaintiff to a low stress job as defined by him, the ALJ relied on plaintiff's reports and testimony that anxiety and increased stress contribute to her fibromyalgia symptoms and findings of anxious mood on examinations.  *Id.*

---

[15] The ALJ also determined that plaintiff possessed the RFC to perform light exertional work with additional limitations.  R. 31.  Plaintiff has not argued that the exertional limitations in the RFC fail to account for her physical impairments.

Neither of these limitations, however, was specifically directed at plaintiff's moderate pace or persistence limitations.

"[L]imitations such as handling simple instructions; making simple work-related decisions; reducing interaction with others; pertaining to changes in work situations and routines; performing simple, routine, and repetitive work; are directed to matters other than questions of persistence and pace." *Della G. v. Saul*, No. 4:20cv124, 2021 WL 2677917, at *13 (E.D. Va. May 25, 2021), *report and recommendation adopted*, 2021 WL 2672010 (E.D. Va. June 29, 2021) (citations omitted). Therefore, because the RFC does not address plaintiff's moderate CPP limitations, the remaining question is whether the ALJ adequately explained why the moderate CPP limitation found at step three did not translate into a limitation in plaintiff's RFC. *Courtney L. v. Saul*, No. No. 2:20cv174, 2021 WL 2046712, at *7 (E.D. Va. May 5, 2021), *report and recommendation adopted*, 2021 WL 2042462 (E.D. Va. May 21, 2021) ("If no RFC restriction is directed to a claimant's pace limitation, the ALJ can comply with *Mascio* by explaining why no pace restriction was required based on the specific details of claimant's condition and limitations.").

If the ALJ sufficiently explained *why* limiting plaintiff to performing "simple, routine tasks" and to working "in a low stress job" accounted for her moderate limitation in CPP *or* explained why plaintiff's moderate limitation in CPP does not affect her "ability to work," remand is unnecessary. *Shinaberry*, 952 F.3d at 121–22 (declining to remand under *Mascio* because the ALJ discussed the relevant evidence and "sufficiently explained why" a limitation to "simple, routine, and repetitive tasks" accounted for the claimant's moderate limitation in CPP). In undertaking this analysis, the Court must consider both the ALJ's analysis of the medical evidence in the record and the resulting limitations in the RFC. *Sizemore v. Berryhill*, 878 F.3d 72, 80–81 (4th Cir. 2017).

In determining plaintiff's RFC, the ALJ cited plaintiff's hearing testimony that, among other things, her fibromyalgia symptoms cause anxiety and that she has trouble completing tasks. R. 32. He also noted plaintiff's impaired concentration and anxiety, her mental status examinations showing anxious and depressed mood and depressive affect, and "fidgety behavior[.]  R. 33. Despite this testimony and plaintiff's reported symptoms including low mood, insomnia, panic attacks, racing thoughts, impaired concentration and anxiety, and plaintiff's noted abnormal mood or affect, the ALJ pointed to positive mental status examinations and provider notes that plaintiff demonstrated "moderate progress and a fair prognosis with a treatment regimen of medication." R. 33–34.

Rather than explain why the RFC did not require a pace- or persistence-related limitation, the ALJ tried to "counterbalance" plaintiff's mental impairments "by noting more favorable findings relative to plaintiff's mental state." *Peter J. H.*, 2023 WL 5967591, at \*12; *see also* R. 30, 33–34 (citing 383, 395, 513, 543, 613, 913, 917, 921, 925, 929, 934, 945, 963, 1018, 1037, 1050, 1063).  The ALJ observed that, despite plaintiff's abnormal mood or affect, the medical evidence "also shows findings of intact cognition, including normal concentration, intact memory, logical thought process, and normal thought content." R. 34.  The ALJ further observed that plaintiff's mental status examinations revealed good eye contact, appropriate affect, calm mood, normal energy, pleasant attitude, and cooperative behavior, and that plaintiff was volunteering at a nonprofit. *Id.* Although the ALJ concluded that these observations did "not indicate greater mental limitations than found" in the RFC, R. 34, few, if any, "of these positive findings bear on plaintiff's CPP abilities[,]" *Peter J. H.*, 2023 WL 5967591, at \*12.

For example, plaintiff's intact memory, calm mood, and pleasant attitude, have little bearing on her ability to work full-time absent CPP limitations. *See Ollis v. Berryhill*, No.

2:17cv33, 2017 WL 7167171, at *13 (E.D. Va. Dec. 18, 2017) (finding that these "favorable mental status observations are, in and of themselves, insufficient to explain whether [plaintiff] could work full-time on a weekly basis" when the ALJ found that CPP functional limitations were established by the record). "[T]he mere presence of these positive examinations does not negate the fact that, as the ALJ recognized, [p]laintiff also experienced moderate functional limitations in concentration, persistence, and pace." *Courtney L.*, 2021 WL 2046712, at *10 (citing *Ollis*, 2017 WL 7167171, at *13). Although some of these positive examinations revealed plaintiff had normal concentration and attention, the ALJ did not explain how these findings establish that plaintiff is "capable of full time work without an accommodation directed to the pace of that work." *Id.*; *see also Peter J. H.*, 2023 WL 5967591, at *12 ("[T]he link between the ALJ's discussion of the medical evidence and the RFC's omission of moderate limitations in CPP is absent from the ALJ's analysis." (citation omitted)). The same is true for plaintiff's volunteer work at a nonprofit, which, without further details about hours and frequency, falls shorts of explaining whether she is able to work full-time without accommodation.

The ALJ also found the opinions of the state agency psychological consultants to be "partially persuasive."[16] R. 34. The ALJ concluded that the consultant's "findings are consistent with evidence of panic attacks, impaired concentration, and anxious mood[.]" *Id.* (citing R. 912–13, 917–18, 951, 955). Yet, the ALJ overlooked their conclusion that plaintiff has "sustained concentration and persistence limitations[,]" and, more specifically, is moderately limited in, among other things, her ability to: (a) maintain attention and concentration for extended periods;

---

[16] The ALJ disagreed only with the psychological consultants' conclusion that plaintiff "has moderate social limitations[.]" R. 34 (citing R. 72, 82). That said, the ALJ noted that "the consultants included no social interaction limitation in their mental residual functional capacity." *Id.*

(b) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and (c) complete a normal workday or workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. R. 71, 82. In the narrative following these ratings, both consultants opined that the "[o]verall evidence" indicated that plaintiff is capable of simple, routine tasks, R. 72, 83, but did not explain whether plaintiff could stay on task on a regular and consistent basis, *Mascio*, 780 F.3d at 638. The ALJ failed to adequately explain how he reconciled the state agency consultants' (and his own) conclusion that plaintiff has moderate limitations in CPP and yet required no related limitations.[17] *Peter J. H.*, 2023 WL 5967591, at *11. The Court finds this especially troublesome given that VE Earl testified that to maintain employment as either a ticket marker or office helper, a person could not be off task more than 10 percent of the time, and "[a]nything over that would eliminate employment[.]" R. 60–61.

Indeed, the ALJ concluded that plaintiff's report of CPP-related symptoms—that she can pay attention for only 5 to 10 minutes and does not finish what she starts—and evidence showing

---

[17] The ALJ found Dr. Weisman's opinions not persuasive. R. 34–35 (citing R. 1094–98). Dr. Weisman opined that plaintiff was "unable to use foot controls or perform fine manipulation; can only sit, walk, or stand for one hour in an 8-hour day; would be off task for 80 percent of a workday; would require extra breaks; [and] would be absent 15 days per month." *Id.* Additionally, Dr. Weisman found that plaintiff had several marked limitations, including in her ability to, among other things, maintain attention and concentration for extended periods and to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. *Id.*; *see also* R. 1097.

The ALJ concluded that Dr. Weisman's opinions were not supported by and conflicted with Dr. Weisman's examination records. R. 34–35. While the ALJ agreed that "the objective medical evidence supports limitations to [plaintiff]'s ability to do work-related activities," he concluded that "it does not support the degree of restriction that Dr. Weisman opined." R. 34. Specifically, the ALJ cited treatment records that show, among other things, normal appearance, mood, and behavior; full strength; normal gait and balance; normal coordination; normal concentration; and calm, pleasant, and cooperative behavior. R. 34–35 (citing 513, 535, 614, 893, 922, 926, 946, 1037).

panic attacks, racing thoughts, anxious mood, and an observation of fidgeting "support[] *significant limitation* in" CPP at step three. R. 30 (emphasis added). Yet, in concluding that the record supported a moderate limitation in CPP, the ALJ relied on plaintiff's ability to prepare her own basic meals and shop for groceries and household supplies on the computer, which suggested "an ability to perform simple tasks." *Id.* This explanation encompasses only the ALJ's basis for concluding that plaintiff could perform simple tasks, not that she could stay on task. *Mascio*, 780 F.3d at 638.

Like the RFC limitations in *Mascio*, the ones here do not address plaintiff's moderate limitations in CPP. The Court cannot determine whether, and if so, how, the ALJ addressed plaintiff's ability to concentrate, persist, or maintain pace throughout the workweek. *Mascio*, 730 F.3d at 637. Thus, the ALJ's RFC is not supported by substantial evidence, and remand is required.

## VI.  **RECOMMENDATION**

For the foregoing reasons, this Court recommends that plaintiff's motion, ECF No. 10, be **GRANTED**, the final decision of the Commissioner be **VACATED**, and the case be **REMANDED**.

## VII.  **REVIEW PROCEDURE**

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with

a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.      A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).


_____
Robert J. Krask
United States Magistrate Judge


Norfolk, Virginia
December 9, 2024